UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LATONDA N. ARNOLD,

                         Plaintiff,              Civil Action No. 15-14068
                                                 Honorable Marianne O. Battani
                                                 Magistrate Judge David R. Grand
v.

COMMISSIONER OF
SOCIAL SECURITY,

                         Defendant.
_____/

## REPORT AND RECOMMENDATION
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [14, 17]

Plaintiff Latonda N. Arnold ("Arnold") brings this action pursuant to 42 U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Supplemental Security Income ("SSI") under the Social Security Act (the "Act"). Both parties have filed summary judgment motions [14, 17], which have been referred to this Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).

## I.       RECOMMENDATION

For the reasons set forth below, the Court finds that substantial evidence supports the Administrative Law Judge's ("ALJ") conclusion that Arnold is not disabled under the Act. Accordingly, the Court recommends that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Arnold's Motion for Summary Judgment [14] be DENIED, and that pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision be AFFIRMED.

## II.     REPORT

### A.     Procedural History

On September 21, 2012, Arnold filed an application for SSI, alleging a disability onset date of August 15, 2008.[1]   (Tr. 115, 121).   Arnold later amended her onset date to be her application date.  (Tr. 32).  This application was denied at the initial level.  (Tr. 66-69).  Arnold filed a timely request for an administrative hearing, which was held on January 23, 2014, before ALJ Michael R. Dunn.  (Tr. 24-51).  Arnold, who was represented by attorney Heidi G. Walkon, testified at the hearing, as did vocational expert Pauline Pegram.  (*Id.*).  On July 18, 2014, the ALJ issued a written decision finding that Arnold is not disabled under the Act.  (Tr. 8-23).  On October 5, 2015, the Appeals Council denied review.  (Tr. 1-5).  Arnold timely filed for judicial review of the final decision on November 19, 2015.  (Doc. #1).  On April 5, 2016, Arnold filed a Motion for Summary Judgment.  (Doc. #14).  The Commissioner filed a Motion for Summary Judgment on June 28, 2016 (Doc. #17), and Arnold filed a reply on July 25, 2016.  (Doc. #18).

### B.     Framework for Disability Determinations

Under the Act, SSI benefits are available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

---

[1] Arnold previously applied for disability insurance benefits.  (Tr. 140).  This application was denied at the initial level on February 8, 2007.  (*Id.*).

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§ 404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### C.    Background

#### 1.    Arnold's Reports and Testimony

At the time of the administrative hearing, Arnold was 44 years old, and at 5'3'' tall, weighed 165 pounds.  (Tr. 30-31).  She lived in a two-story house with her father.[2]  (Tr. 30, 161, 266, 271).  Arnold's highest level of education is one year of college.  (Tr. 31, 145, 279).  Prior to the alleged onset date, between 1999 and 2008, she worked as a general laborer at a factory for

---

[2] On December 4, 2012, Consultative Examiner Katherine H. Karo, D.O., noted that for Arnold to reach her bedroom, which was located in the basement, she had to go up three steps at the entrance of the house and then down an additional nine steps.  (Tr. 270).

car parts.  (Tr. 41, 145, 271, 279).  This was a temporary job, where she did line work, quality control, and packaging for ten to twelve hours and was required to lift more than twenty pounds. (Tr. 41).  Arnold also worked as a babysitter in 2011.  (Tr. 31-32).

Arnold alleges disability as a result of various physical conditions involving her hip, including bilateral aseptic necrosis, a fractured hip, and arthritis.  (Tr. 144).  She had surgery on her right hip in 1993, but apparently it did not help and may have made her condition worse, so she eventually might need a hip replacement.  (Tr. 192-94, 258, 265, 270, 278-79).  She has pain in both hips.  (Tr. 37, 192-93, 234, 270).  The pain is worse on her left side, where it extends to her back, knee, and sometimes up her thigh.  (*Id.*).  She also alleges disability as a result of depression.[3]  (Tr. 144).

Arnold takes no medications.  (Tr. 33, 146, 168, 255-56, 265, 270, 272, 278-80).  But even if they were prescribed to her, she does not have health insurance and would not be able to afford them.  (Tr. 32, 116, 252, 254, 256, 261-62).  She was previously taking Motrin three to four times a day until it gave her two ulcers.  (Tr. 33, 192, 199).  Arnold finds relief by using a spray for muscle pain.  (Tr. 39).  She also finds relief by lying down on her back or on her right side for thirty minutes to an hour (if she lies down on her left side, she feels pain or stiffness). (Tr. 33, 39-40).  She does this up to four times a day, although sometimes she doesn't get up at all and just "lay[s] there because [she doesn't] want to deal with that pain."  (Tr. 40).  When sitting, she has to elevate her leg.  (*Id.*).  Otherwise, she will be in pain and her leg will get stuck in a bent position; it will then take her a few minutes to straighten it and stand up completely. (*Id.*).  She used to use a knee brace, but it no longer helps her.  (Tr. 34).  She came to the hearing using a cane, which she got from her aunt and not through a doctor's prescription.  (Tr. 33).  The

---

[3] The ALJ found this to be a non-severe impairment.  (Tr. 13-15).  Arnold does not contest this finding, so the Court will focus its analysis on her physical impairments.

4

cane helps her walk better when she is in pain (as compared to without it) and helps her balance. (Tr. 33-34).  When not using it, she has come close to falling.  (Tr. 34).

Arnold testified that she can sit and stand for fifteen to twenty minutes;[4] walk half a block without a cane and walk one block with a cane (walking slowly and needing to rest a few minutes before she can resume walking); and lift up to twenty-five pounds.  (Tr. 34, 39, 161, 166).  She can use stairs, but because of the pain in her left hip, she only uses her right leg to go up and down them and relies on a handrail.  (Tr. 38-39, 291).  She runs errands and cares for her dog.  (Tr. 162).  She goes grocery shopping (using her cane and leaning on the shopping cart) and goes to stores to shop for clothing and household items for up to three hours at a time.  (Tr. 36, 164).  She goes outside daily and does not need to be accompanied when she leaves her house.  (Tr. 164).  In her Function Report, she wrote that she travels by foot, car, and public transportation.[5]  (Tr. 164, 291).  She does not drive due to a suspended license.  (Tr. 164, 266).  She has trouble sleeping at night because of her pain.  (Tr. 162).

Arnold is able to take care of her personal needs.  (Tr. 171, 268, 271, 291).  She can dress herself but has trouble putting on pants, socks, and shoes.  (Tr. 35, 162).  When using the toilet, she has difficulty sitting down and standing up, so to change positions she has to find something to hold on to.  (Tr. 38, 162).  She is able to shower but cannot bathe because she is unable to get in and out of a tub.  (Tr. 35).  She does household chores:  laundry, ironing, cleaning, and

---

[4] This estimate is from Arnold's testimony during the January 23, 2014 administrative hearing. (Tr. 34).  In her October 27, 2012 Function Report, however, she said she can sit and stand for ten minutes.  (Tr. 166).  On December 4, 2012, Consultative Examiner Katherine H. Karo, D.O., noted that Arnold can sit, stand, and walk for ten minutes.  (Tr. 270).

[5] During the January 23, 2014 administrative hearing, which took place approximately two years after Arnold filled out her Function Report, Arnold testified that she had not taken a bus in around two years.  (Tr. 39).  She testified that at that point, it would be "too hard" for her to take the bus because she couldn't lift her left leg, so she would have to pull herself up on to the bus by grabbing both sides of the railing.  (*Id.*).

5

washing dishes. (Tr. 35, 163, 266). She prepares full meals three to four times a week, which can take one to two and a half hours (with breaks to sit down), and she is able to feed herself. (Tr. 35, 163, 291). She is able to pay bills, count change, handle a savings account, and use a checkbook. (Tr. 164). On a typical day, she reads, listens to music, watches television, uses a computer, writes in her journal, walks, does puzzles, plays cards, and visits family and friends.[6] (Tr. 36, 165, 266). She does some of these activities daily and "very well." (Tr. 165). She is able to socialize and does not have problems interacting with others. (Tr. 36-37, 165-66, 266).

2.     *Arnold's Son's Third Party Function Report*

Arnold's twenty-three-year-old son, D'Andre Arnold, filled out a Third Party Function Report on behalf of his mother on October 27, 2012. (Tr. 153-160). His report is mostly consistent with his mother's, and states that Arnold's conditions limit her ability to sit and stand for long periods of time. (Tr. 153, 158). He stated that sometimes it is hard for her to get out of bed and walk and that she uses a cane and a brace "for any leg activity." (Tr. 153, 159). According to her son, on a typical day, Arnold bathes; reads and writes (he said she does these daily and "well"); and runs errands. (Tr. 153-54, 157). He reported that she does not take care of anyone else, but she does care for a pet. (Tr. 154). He said her condition makes it hard for her to sleep; put on pants, socks, and shoes; and get out of the tub. (*Id.*). He reported that she leaves the house every day; does not need to be accompanied; and travels by foot, car, and public transportation. (Tr. 156). He stated that she is able to go grocery shopping; prepare complete meals for a couple of hours a few times a week; wash dishes; dust; and iron. (Tr. 155). But she is limited to "certain" housework and cannot do yard work. (Tr. 156). He reported that she does

---

[6] On December 4, 2012, Arnold reported going to church and volunteering at the church's food pantry. (Tr. 266). But during the administrative hearing on January 23, 2014, she seemed to indicate that this was no longer the case. (Tr. 36).

not need reminders or encouragement; can handle money; and has no problems interacting with others. (Tr. 155-57).

### 3. Medical Evidence

The Court has thoroughly reviewed Arnold's medical record. In lieu of summarizing her medical history here, the Court will make references and provide citations to the record as necessary in its discussion of the parties' arguments.

### 4. Vocational Expert's Testimony

Pauline Pegram testified as an independent vocational expert ("VE") at the administrative hearing. (Tr. 42-48). The VE characterized Arnold's past relevant work as a hand packager as unskilled in nature. (Tr. 43). She said it is medium according to both the Dictionary of Occupational Titles ("DOT") and according to Arnold. (*Id.*). As for Arnold's past relevant work as a child monitor (or babysitter), the VE characterized this as semi-skilled in nature and medium according to the DOT. (*Id.*). She said the skills from this position would not transfer to other semi-skilled positions because it is "so minimally semi-skilled that it's rather job-specific." (*Id.*).

The ALJ asked the VE to imagine a hypothetical individual of Arnold's age, education, and work experience that was limited to light work; lifting and carrying up to twenty pounds occasionally and ten pounds frequently; a required sit/stand option every twenty minutes, provided that the exercise of the sit/stand option itself will not cause the individual to be off task more than ten percent of the day; no standing or walking for more than two hours in an eight-hour day; sitting for six hours in an eight-hour day; never being required to operate foot controls; occasionally climbing ramps and stairs but no more than one flight of stairs and with the use of a handrail; never being required to climb ladders or scaffolds; occasional balancing, stooping, and crouching but never being required to kneel or crawl; no exposure to unprotected heights; must

avoid exposure to hazardous machinery; should avoid concentrated exposure to wetness; and must avoid concentrated exposure to extreme cold.  (Tr. 44).  The VE testified that the hypothetical individual would not be capable of performing Arnold's past work.  (Tr. 45).  The VE also testified that Arnold has no transferable skills to other jobs.[7]  (*Id.*).

The ALJ then asked the VE to imagine a hypothetical individual with the same limitations as in the previous hypothetical but with the exertion level reduced to sedentary.  (Tr. 46).  In addition, the work must allow for the use of a hand-held assistive device when the individual is walking and going from sitting to standing (or vice versa), but not when the individual is standing in place at the work station.  (*Id.*).  The work also must allow for the use of the non-dominant contralateral upper extremity to lift and carry up to the exertional limitations. (*Id.*).  The VE testified that setting employer preferences aside,[8] these limitations would not preclude the individual's ability to do the following sedentary jobs:  hand packager (3, 500 jobs in Michigan; 60,000 nationally); hand assembler (4,000 jobs in Michigan; 80,000 nationally); and inspector and sorter (2,500 jobs in Michigan; 50,000 nationally).  (Tr. 46-47).  Since the DOT does not address the use of a hand-held assistive device, this answer was based on the VE's professional work experience.  (Tr. 48).

Next, the ALJ asked the VE to imagine a hypothetical individual with the same limitations as in the previous example, but who must elevate his or her left leg to waist level whenever he or she is in a seated position.  (Tr. 47).  The VE testified that this would require a

---

[7] Still, the VE listed the following broad groupings of occupations for light jobs with a sit/stand option:  hand packaging (8,000 jobs in Michigan; 130,000 nationally); hand assembler (8,000 jobs in Michigan; 150,000 nationally); and inspector and sorter (4,000 jobs in Michigan; 80,000 nationally).  (Tr. 45).  This was based on the VE's professional work experience because the DOT does not address the sit/stand option.  (Tr. 48).

[8] The VE clarified that while an employer might prefer that the individual not use a cane to get up from a seated position, this "does not affect the ability to actually do the work task."  (Tr. 46).

jobsite modification and would therefore take the individual out of the competitive marketplace.[9] (Tr. 47-48).  The VE testified that this answer was based on her professional work experience because the need to elevate is not covered in the DOT or the Selected Characteristics of Occupations.  (Tr. 47).

The VE also testified that if a hypothetical individual from any of the hypotheticals above had to be off task for twenty percent of the day, in addition to regularly scheduled breaks, it would preclude competitive work.  (Tr. 48).  Moreover, if a hypothetical individual consistently missed three days of work per month, this would also preclude competitive work.  (*Id.*). Percentage off task and absenteeism are not covered by the DOT, so these opinions were also based on the VE's professional work experience.  (*Id.*).

### D.    The ALJ's Findings

At Step One of the five-step sequential analysis, the ALJ found that Arnold did not engage in substantial gainful activity since September 21, 2012 (her application date and amended alleged onset date).  (Tr. 13).  At Step Two, the ALJ found that Arnold has the severe impairments of bilateral aseptic necrosis of the hips and degenerative joint disease of both hips. (Tr. 13-15).  At Step Three, the ALJ found that Arnold's impairments, whether considered alone or in combination, do not meet or medically equal a listed impairment.  (Tr. 15).

The ALJ then found that Arnold retains the RFC to perform sedentary work with the following additional limitations:  she requires a sit/stand option every twenty minutes provided that the exercise of the option itself will not cause her to be off task more than ten percent of the day; she should not stand or walk more than two hours in an eight-hour workday and can sit six hours out of an eight-hour workday with the required sit/stand option every twenty minutes; she

---

[9] The VE noted that the maximum accommodation of this type is at footstool height, where the elevated leg can fit under a table or workbench.  (Tr. 47).

can never operate foot controls; she can occasionally climb ramps or stairs but should be limited to no more than one flight and with the use of a handrail; she should never be required to climb ladders or scaffolds; she can occasionally balance, stoop, and crouch but should never be required to kneel or crawl; she should not be exposed to unprotected heights; she must avoid exposure to hazardous machinery; she should avoid concentrated exposure to wetness; she must avoid concentrated exposure to extreme cold; she uses a hand-held assistive device when walking or changing position from sitting to standing (or vice versa), but she does not require a hand-held assistive device to stand in place at the work station; and she may use the contralateral upper extremity on her non-dominant hand to lift and carry up to exertional limits. (Tr. 15-19).

At Step Four, the ALJ concluded, based in part on the VE's testimony, that Arnold is unable to perform her past relevant work as a child monitor and hand packager (medium). (Tr. 19). At Step Five, the ALJ found that considering Arnold's age, education, work experience, and RFC, she can perform the following jobs that exist in significant numbers in the national economy: inspector (50,000 jobs); hand packager (60,000 jobs); and hand assembler (80,000 jobs). (Tr. 19-20). As a result, the ALJ concluded that Arnold is not disabled under the Act. (Tr. 20).

### E.    Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d

647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility."  *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13; *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ or this court discuss every piece of evidence in the administrative record.  *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all evidence without directly addressing in his written decision every piece of evidence submitted by a party.") (internal quotations omitted).  If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v.*

*Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'").

### F.    Analysis

In her motion for summary judgment, Arnold argues that:  (1) the ALJ erred in evaluating whether she met or medically equaled Listing 1.02(A); (2) the ALJ made an improper credibility determination; (3) the ALJ erred in not considering her lack of medical insurance; and (4) the ALJ erred in finding that she could perform work that required a sit/stand option.  Each of these arguments is addressed below.

#### 1.    Substantial Evidence Supports the ALJ's Evaluation of Listing 1.02(A)

Arnold argues that the ALJ erred in determining that her impairments did not meet or medically equal Listing 1.02(A) because the evaluation was brief, contained no meaningful analysis, and lacked citations to the medical record.  (Doc. #14 at 11).  She also argues that the ALJ erred because he failed to obtain a medical expert opinion.  (*Id.*).  The Court finds no error warranting remand.

Arnold bears the burden of proving at Step Three that her impairments meet or medically equal a particular listing.  *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987); *Johnson v. Comm'r of Soc. Sec.*, No. 15-449, 2016 WL 2342892, at *4 (W.D. Mich. Apr. 15, 2016) (citing *Bingaman v. Comm'r of Soc. Sec.*, 186 Fed. Appx. 642, 645 (6th Cir. 2006) ("Plaintiff bears the burden of establishing that [she] satisfies the requirements of a listed impairment."); *Gower v. Comm'r of Soc. Sec.*, No. 13-14511, 2015 WL 163830, at *26 (E.D. Mich. Jan. 13, 2015) (citing *Thacker v. Soc. Sec. Admin.*, 93 F. App'x 725, 728 (6th Cir. 1994)).  The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes

impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. § 416.925(a).  In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled.  *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011).  "A claimant must satisfy all of the criteria to meet the listing," *Rabbers*, 582 F.3d at 653, and all of these criteria must be met concurrently for a period of at least twelve continuous months.  *See* 20 C.F.R. §§ 416.925(c)(3)-(4), 416.909; 20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *see Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Here, to have met the criteria of Listing 1.02(A), Arnold had to establish that she suffers from a major dysfunction of one or more joints, resulting from any cause, that is

> [c]haracterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s).  With:
>
> A.  Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b.

13

20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02(A).  As to the definition of effective

ambulation referenced in subsection (A), § 1.00(B)(2)(b) provides in relevant part:

> b.  What We Mean by Inability To Ambulate Effectively
>
> (1)   Definition.   Inability to ambulate effectively means an extreme
> limitation of the ability to walk; i.e., an impairment(s) that interferes very
> seriously with the individual's ability to independently initiate, sustain, or
> complete activities.  Ineffective ambulation is defined generally as having
> insufficient lower extremity functioning (see 1.00J) to permit independent
> ambulation without the use of a hand-held assistive device(s) that limits
> the functioning of both upper extremities.  (Listing 1.05C is an exception
> to this general definition because the individual has the use of only one
> upper extremity due to amputation of a hand.)
>
> (2)  To ambulate effectively, individuals must be capable of sustaining a
> reasonable walking pace over a sufficient distance to be able to carry out
> activities of daily living.  They must have the ability to travel without
> companion assistance to and from a place of employment or school.
> Therefore, examples of ineffective ambulation include, but are not limited
> to, the inability to walk without the use of a walker, two crutches or two
> canes, the inability to walk a block at a reasonable pace on rough or
> uneven surfaces, the inability to use standard public transportation, the
> inability to carry out routine ambulatory activities, such as shopping and
> banking, and the inability to climb a few steps at a reasonable pace with
> the use of a single hand rail.  The ability to walk independently about
> one's home without the use of assistive devices does not, in and of itself,
> constitute effective ambulation.

20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b).

The ALJ considered this listing in his decision, concluding that Arnold's

> degenerative joint disease does not meet or medically equal section 1.02
> because the impairment is not characterized by a gross anatomical
> deformity and chronic joint pain and stiffness with signs of limitation of
> motion or other abnormal motion and findings on appropriate medically
> acceptable imaging of joint space narrowing, bony destruction, or
> ankylosis resulting in the inability to ambulate effectively.

(Tr. 15).  Arnold finds this evaluation improper because, according to her, it "merely sets forth

the definition of 1.02(A) with no analysis whatsoever."  (Doc. #14 at 11).  In evaluating whether

Arnold satisfied her burden of establishing that she met Listing 1.02(A), the ALJ's decision had

14

to provide "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record" – including whether Arnold's impairments met or medically equaled Listing 1.02(A).  5 U.S.C. § 557(c)(3)(A).  At the same time, "[a]n ALJ does not have to cite to every piece of evidence to show [he] considered it . . . or arrange the decision in a particular manner to show [he] analyzed the evidence."  *Gower*, 2015 WL 163830, at *28 (citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006); *Jones v. Barnhart*, 364 F.3d 501, 505 (3rd Cir. 2004)).  While it might be preferable for an ALJ to explicitly tie her discussion of a relevant listing's elements to specific medical evidence, the Sixth Circuit "has allowed courts to scan the decision for statements that support the step three analysis, and numerous district and circuit courts have agreed" on this.  *Johnson v. Comm'r of Soc. Sec.*, No. 13-14797, 2015 WL 730094, at *26 (E.D. Mich. Feb. 19, 2015).  Thus, "a court can find the listing analysis sufficient by looking at the entire opinion," rather than limiting its review to any particular section of the ALJ's decision.  *Id.*  As a result, "an ALJ need not fully discuss the Step III findings so long [as] 'the ALJ's decision, read as a whole, illustrates that the ALJ considered the appropriate factors in reaching the conclusion that the Plaintiff did not meet the requirements for [the] listing.'"  *Vandenboss v. Comm'r of Soc. Sec.*, No. 14-12283, 2015 WL 3823558, at *5 (E.D. Mich. June 18, 2015).

A review of the ALJ's decision as a whole makes clear that he appropriately considered evidence in the record that supports his Step Three analysis.  At Step Two, he considered the opinion of Consultative Examiner David L. Hayter, Ph.D., who on December 4, 2012, noted that Arnold was responsible for all of the chores at her home, appeared to be able to care for herself, and that her daily activities included, among other things, volunteering at her local church and watching her grandson.  (Tr. 14).

At Step Four, the ALJ considered X-rays from February 14, 2011 of Arnold's left and right hip, cervical spine, thoracic spine, and lumbar spine. (Tr. 17). Although the X-rays of her spine were "essentially unremarkable," the X rays of her hips "revealed avascular necrosis with partial collapse of the femoral head" and "associated advanced osteoarthritic changes of the left hip." (*Id.*). Meanwhile, "[t]he right hip showed intact orthopedic hardware with associated moderate osteoarthritis changes," which "may have been secondary to avascular necrosis that did not collapse the femoral head." (*Id.*). Of particular import as to Arnold's ability to ambulate, the ALJ discussed the findings of Consultative Examiner Katherine H. Karo, D.O., who noted that Arnold "presented to the evaluation without the use of an assistive device" and was able to ambulate without one, although her "gait was antalgic with limping on the right." (*Id.*). The ALJ reviewed medical findings that Arnold was able to heel walk, toe walk, and tandem walk; could sit, stand, and walk for ten minutes (but all three were "limited secondary to her subjective complaint of pain"); could sit and stand without assistance; could stand on one leg at a time (on both sides); could bare weight without pain; and was able to squat, bend, stoop, carry, push, and pull. (*Id.*). The ALJ also mentioned Dr. Karo's notes that Arnold used stairs in her two-story home and was "independent" with her activities of daily living, but her father helped her with "advanced" activities. (*Id.*).

The ALJ reviewed additional findings that Arnold had a limp on the right side but could tandem walk, heel walk, and toe walk "slowly"; used a cane for balance and support and needed the assistance of a cane to ambulate (even though Arnold did not use her cane during Dr. Shelby-Lane's examination); would have difficulty with prolonged standing, stooping, squatting, lifting, and bending; and needs "updated care" for her right hip and knee. (Tr. 18). In addition, the ALJ considered Dr. Shelby-Lane's opinion that Arnold was able to shop, travel unaccompanied, care

for her personal hygiene, prepare a simple meal and feed herself; ambulate without using a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use public transportation; and climb a few steps at a reasonable pace with the use of a single handrail.   (*Id.*).   This last portion on ambulation tracks the language of the listing's reference to § 1.00(B)(2)(b) quite closely and is therefore particularly indicative that the ALJ appropriately considered the objective medical evidence in determining that Arnold did not meet Listing 1.02(A).[10]   *Johnson*, 2015 WL 730094, at *27 (concluding that the ALJ's decision "indicates he sufficiently considered the listing" because "his discussion implicating the listing

_____

[10] In short, it is clear that substantial evidence, considered by the ALJ (Tr. 17-19), supports the ALJ's finding that Arnold did not meet or medically equal Listing 1.02(A) because the record indicates that Arnold was able to ambulate effectively.  20 C.F.R. § Pt. 404, Subpt. P, App. 1, § 1.00(B)(2)(b).  Arnold did not display an "extreme limitation of the ability to walk" because she completed household chores (Tr. 266); took care of her personal needs (Tr. 268); and went to appointments unaccompanied.  (Tr. 265).  Her use of a hand-held assistive device was inconsistent, and when she did use one, she used a cane, which does not require the use of both hands.  (Tr. 270, 272, 274 (finding that clinical evidence does not support the need for Arnold to use a walking aid), 280 (noting that Arnold had a cane but did not use it during the exam)).  Although on February 10, 2014, Dr. Shelby-Lane found that clinical evidence supported the need for Arnold to use a walking aid, she marked that it was to "reduce pain," leaving the following potential explanation unchecked:  "Needed; Would Fall Without Aid; Clinically Req'd."  (Tr. 285).  Despite Dr. Shelby-Lane's notes that the use of a cane was "medically necessary" and "required" for Arnold to ambulate, on the same date, Dr. Shelby-Lane also opined that Arnold could ambulate for thirty to sixty minutes without one.  (Tr. 287).  And, while the record indicates that Arnold's gait was antalgic and that she walked with a limp on her right side (Tr. 194, 272, 274, 280, 285), Dr. Shelby-Lane concluded that Arnold could perform activities like go shopping; travel without a companion for assistance; ambulate without using a wheelchair, walker, two canes, or two crutches; walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation; climb a few steps at a reasonable pace using a single handrail; prepare a simple meal and feed herself; and care for her personal hygiene.  (Tr. 291).  Dr. Shelby-Lane indicated that even when using a cane, Arnold would still be able to use her free hand to carry small objects.  (Tr. 287).  Thus, even though Arnold had some difficulty walking, the evidence in the record demonstrates that it did not rise to the level of an inability to ambulate under § 1.00(B)(2)(b).  *Johnson*, 2016 WL 2342892, at *4 (finding that the ALJ's determination that claimant failed to carry his burden that he satisfied Listing 1.02(A) is supported by substantial evidence, in part, because "[w]hile Plaintiff experiences a serious hip impairment which undoubtedly impacts his ability to walk, the record reveals that [he] has nevertheless not lost the ability to ambulate effectively").

was explicit and conveys that he adequately considered the necessary requirements," even "[t]hough he did not repeat his analysis in the step three section of his decision").

Arnold argues that "the evidence shows an inability to ambulate effectively," as required by Listing 1.02(A). (Doc. #14 at 12). But in making this argument, Arnold does not point to what evidence the ALJ should have considered.[11] In her reply brief, Arnold argues that she meets this definition, for instance, because she had a limp, walks slowly, and uses a cane for balance and support. (Doc. #18 at 2-3). But this argument is insufficient. For the reasons explained above in the Court's analysis of § 1.00(B)(2)(b), Arnold has not shown that the ALJ erred in determining that she could ambulate effectively. *Johnson*, 2016 WL 2342892, at *4 (concluding that the claimant's assertion that he "has problems walking" does not preclude a finding, based on the evidence in the record, that he can ambulate effectively under Listing 1.02(A)); *see Vandenboss*, 2015 WL 3823558, at *6.

Substantial evidence also supports the ALJ's finding regarding Listing 1.02(A) in other respects. Evidence regarding a gross anatomical deformity (for example, subluxation, contracture, bony or fibrous ankylosis, or instability) is lacking. On February 14, 2011, Gerald M. Hillman, M.D., opined that Arnold's cervical, thoracic, and lumbar spine was in normal alignment and, as the ALJ noted, the results of her exam were "essentially unremarkable." 20 C.F.R. § Pt. 404, Subpt. P, App. 1, Listing 1.02(A); (Tr. 17, 242). Her cervical spine showed no fracture, subluxation, or abnormal soft tissue swelling. (*Id.*). No paraspinal mass was found in her thoracic spine. (*Id.*). Similarly, on December 4, 2012, Dr. Karo noted no swelling, fracture,

---

[11] Arnold does, however, point to evidence the ALJ should have considered in reviewing whether she met or equaled other portions of Listing 1.02(A). (Doc. #14 at 12-13). But this argument fails because the ALJ did consider the bulk of this evidence in his decision. *See supra* pp. 15-17. Furthermore, even if she had met other portions of the listing, the ALJ's finding that she is able to ambulate effectively defeats any possibility of her meeting her burden of demonstrating that she meets or medically equals all of the criteria of Listing 1.02(A).

dislocation, or muscle atrophy. (Tr. 271-72). On February 10, 2014, Dr. Shelby-Lane found no obvious spinal deformity, swelling, or muscle spasm; no muscle atrophy; and no joint deformity or enlargement. (Tr. 280). Thus, substantial evidence supports a finding that Arnold did not meet this criteria of Listing 1.02(A).

Finally, Arnold argues that the ALJ erred in failing to obtain a medical expert opinion as to whether she met or medically equaled Listing 1.02(A). (Doc. #14 at 11). "When a claimant has a listed impairment but does not meet the criteria, an ALJ can find that the impairment is 'medically equivalent' to the listing if the claimant has 'other findings related to [the] impairment that are at least of equal medical significance to the required criteria.'" *Thomas v. Comm'r of Soc. Sec.*, No. 12-14758, 2014 WL 688197, at *8 (E.D. Mich. Feb. 21, 2014) (quoting 20 C.F.R. § 416.926(a)). To that end, Social Security regulations mandate "that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight." SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996); *see also Retka v. Comm'r of Soc. Sec.*, No. 94-2013, 1995 WL 697215, at *2 (6th Cir. Nov. 22, 1995) (noting that "[g]enerally, the opinion of a medical expert is required before a determination of medical equivalence is made"). But the Sixth Circuit has held that where the evidence in the record supports the ALJ's conclusion, "there is no merit to the plaintiff's argument that the ALJ erred in failing to find his condition equivalent to the Listing." *Gower*, 2015 WL 163830, at *26 (quoting *Retka*, 70 F.3d 1272, at *2); *Johnson*, 2015 WL 730094, at *25 (quoting *Retka*, 70 F.3d 1272, at *2). The Sixth Circuit has instead "shifted the focus to 'the claimant's burden . . . to bring forth evidence to establish that he or she meets or equals a listed impairment." *Id.* "Consequently, an ALJ's Listing

analysis must be viewed in light of the evidence the claimant presents." *Id.*

Here, as explained above, substantial evidence supports the ALJ's finding that Arnold did not meet or medically equal Listing 1.02(A).  Arnold has not met her burden of demonstrating otherwise, and thus the ALJ did not err in not obtaining a medical expert opinion.  *Bracey v. Comm'r of Soc. Sec.*, No. 10-12659, 2011 WL 3359678, at *3, 5 (E.D. Mich. July 13, 2011) (recommending that the plaintiff's motion for summary judgment be denied where the plaintiff did not meet his burden of establishing that he was disabled under Listing 1.02 even though "no medical expert opined that [he] had impairments that equaled the severity of any listing").

For the reasons explained above, the ALJ's determination that Arnold's impairments did not meet or medically equal Listing 1.02(A) is supported by substantial evidence.

### 2.   Substantial Evidence Supports the ALJ's Credibility Determination

In his decision, the ALJ found that Arnold's "statements concerning the intensity, duration and limiting effects of [her] symptoms are not entirely credible and are inconsistent with the totality of the evidence."  (Tr. 19).  Arnold argues that the ALJ erred in evaluating her credibility because, in her view, he does not point to any inconsistencies in the record[12] nor does he sufficiently explain the basis of his decision with references to the record.  (Doc. #14 at 14-15.  Arnold cites to Social Security Ruling ("SSR") 96-7p[13] in arguing that the ALJ's credibility assessment cannot be a "blanket assertion" and must be "sufficiently specific" in laying out the

---

[12] An ALJ's credibility determination is not based solely on a finding of inconsistencies in the record.  SSR 16-3p, 2016 WL 1119029, at *5 (Mar. 16, 2016) ("A report of minimal or negative findings or inconsistencies in the objective medical evidence is one of the many factors we must consider in evaluating the intensity, persistence, and limiting effects of an individual's symptoms.").  As a result, a finding of no inconsistencies does not necessarily lead to a determination that a claimant is credible.

[13] SSR 96-7p has been superseded by SSR 16-3p.  SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  The Court will therefore reference this later ruling in its analysis.

weight given to the individual's statements and the reason for the weight given. (*Id.* at 15). The Court disagrees with Arnold's argument.

The Sixth Circuit has held that determinations of credibility rest with the ALJ because "the ALJ's opportunity to observe the demeanor of the claimant 'is invaluable, and should not be discarded lightly.'" *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981) (quoting *Beavers v. Sec'y of Health, Ed. & Welfare*, 577 F.2d 383, 387 (6th Cir. 1978)). Thus, an ALJ's credibility determination will not be disturbed "absent compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The ALJ is not simply required to accept the testimony of a claimant if it conflicts with medical reports and other evidence in the record. *See Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 531 (6th Cir. 1997). Rather, after the ALJ finds a medical condition that could reasonably be expected to produce the claimant's alleged symptoms, he must consider "the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record" to determine if the claimant's claims regarding the severity of her symptoms are credible. SSR 16-3p, 2016 WL 1119029, at *4 (Mar. 16, 2016); *see also* 20 C.F.R. § 416.929. In making an adjudication, a "single, conclusory statement" asserting consideration of the individual's symptoms or reciting the factors in the regulations is insufficient. SSR 16-3p, 2016 WL 1119029, at *10 (Mar. 16, 2016). Instead, "[t]he determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." *Id.*

Arnold challenges the ALJ's conclusion that her "statements are only partially credible 'for the reasons [explained] in this decision.'" (Doc. #14 at 14) (quoting Tr. 17). Arnold argues that "it is not clear what the ALJ is referring to in this statement." (*Id.*). But, as discussed in detail below, following the words "for the reasons explained in this decision," the ALJ provided a two-page analysis where he reviewed Arnold's medical records, the opinions of two consultative examiners and a State agency examiner, Arnold's Function Report, and her son's Third Party Function Report. (Tr. 17-19). On the previous page, he reviewed Arnold's hearing testimony. (Tr. 16). Thus, his determination was not a "single, conclusory statement" and the ALJ appropriately considered various sources of information in making his credibility determination. SSR 16-3p, 2016 WL 1119029, at *10 (Mar. 16, 2016).

The ALJ thoroughly cited Arnold's medical records to support his credibility determination. The ALJ reviewed X-rays from February 14, 2011 of Arnold's left and right hip, cervical spine, thoracic spine, and lumbar spine. (Tr. 17). Although the X-rays of her spine were "essentially unremarkable," the X rays of her hips "revealed avascular necrosis with partial collapse of the femoral head" and osteoarthritic changes. (*Id.*). The ALJ also took into account Arnold's ongoing complaints of increasing hip and knee pain (recognizing that it allegedly began in the 1990s) (Tr. 16-18), her lack of post-operative treatment (Tr. 17), and that she was taking no medications. (Tr. 16-18). He noted that, at one point, Dr. Shelby-Lane found her to be in no acute distress. (Tr. 18). He also noted that Arnold lies down often (up to four times) in one day, for thirty to sixty minutes at a time, but sometimes longer because of the pain. (Tr. 16).

The ALJ considered that Dr. Karo and Dr. Shelby-Lane noted that Arnold walked with a limp on her right side. (Tr. 17-18). He reviewed documents indicating that Arnold walked both with and without a cane. (Tr. 16-17). He considered Dr. Shelby-Lane's opinion that Arnold

22

needs a cane to ambulate.  (Tr. 18).  He also considered her opinion that Arnold could ambulate without a walking aid (such as a wheelchair, walker, two canes, or two crutches); is able to walk a block at a reasonable pace on rough or uneven surfaces; and can climb a few steps at a reasonable pace using a single handrail.  (*Id.*).  He considered that Arnold goes up three steps, and then down nine steps, to get to her bedroom, located in the basement of her father's two-story house.  (Tr. 17).  The ALJ noted that Arnold could heel, toe, and tandem walk; sit and stand without assistance; and bend, stoop, carry, push, and pull.  (Tr. 17-18).  He also noted her limitations with standing, sitting, walking, using stairs, and getting up from a low chair.  (Tr. 16-17).  He recognized that Dr. Shelby-Lane opined that Arnold would have difficulty with prolonged standing, stooping, squatting, lifting, and bending, and needs "updated care" for her right hip, knee, and lower extremity.  (Tr. 18).  He found that Arnold "received sparse medical treatment" for her hip conditions, for instance, no evidence that she was seen by a specialist, attended physical therapy, participated in pain management, or had any surgeries after her 1995 procedure.  (Tr. 17-18).

In addition, the ALJ properly considered Arnold's activities of daily living as they bear on her credibility.  He reviewed Dr. Karo's notes indicating that Arnold was "independent" with activities of daily living but that her father helped her with "advanced" ones.  (Tr. 17).  He noted that while Arnold and her son's Function Reports attest to some limitations with personal care, other aspects of those reports indicate that Arnold was able to care for a pet; prepare meals three to four times a week; perform household chores; leave the house every day; travel by foot, car, and public transportation; independently shop for groceries, clothing, household items; and handle money.  (Tr. 16, 18).  The ALJ also discussed records by Dr. Shelby-Lane confirming that Arnold was able to shop, travel without assistance, take public transportation, care for her

personal hygiene, and cook and feed herself. (Tr. 18). He took into account that her pain disrupts her sleep. (Tr. 16). He noted that her hobbies included reading, listening to music, writing in her journal, doing puzzles, watching television, being on the computer, and visiting family and friends. (Tr. 16, 18). At the conclusion of this lengthy analysis, the ALJ wrote that the evidence discussed supported his finding that while Arnold's "medically determinable impairments could reasonably be expected to produce the alleged symptoms[, her] statements concerning the intensity, duration and limited effects of [her] symptoms are not entirely credible and are inconsistent with the totality of the evidence." (Tr. 19).

In sum, in assessing Arnold's credibility and the effects of her impairments, the ALJ fairly and properly considered the record evidence, including Arnold's medical records, statements, and activities of daily living, and made clear to Arnold why he found her less than fully credible. The Court finds no reason to disturb the ALJ's credibility determination because the ALJ observed Arnold firsthand, and his two-page detailed evaluation of the severity of Arnold's symptoms and capabilities is supported by substantial evidence in the record. *See Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1998) (finding that the Secretary "did not err in concluding that [the claimant's] complaints of pain were not credible" because the evidence "indicated that [the claimant] was not inconvenienced by his pain and was able to perform a variety of activities").

### 3. The ALJ did not Err in not Considering Arnold's Lack of Medical Insurance

Arnold argues that the ALJ erred because although his decision stated that she "received sparse medical treatment," he "completely ignored" her difficulties with obtaining medical insurance. (Doc. #14 at 15). She argues that because she was unable to pay for her treatment, the ALJ should have "excused" her failure to get it. (*Id.*) (citing SSR 96-7p, 1996 WL 374186

(July 2, 1996)). She seems to argue that as a result, the ALJ has "impermissibl[y]" "drawn his own conclusions" about Arnold's symptoms and their severity, and "without medical evidence as support." (*Id.* at 15-16). The Court disagrees. Arnold's argument is essentially another attack on the ALJ's credibility determination. The Court has already analyzed this issue and found that the ALJ's credibility assessment was proper and is supported by substantial evidence, including substantial medical evidence.

Still, as to Arnold's particular argument regarding the lack of medical insurance, SSR 16-3p provides that it is appropriate for an ALJ to consider an individual's attempts to seek medical treatment – and the reasons, if any, why no treatment was sought – when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities or to function independently. SSR 16-3p, 2016 WL 1119029, at *8 (Mar. 16, 2016); *Harris v. Comm'r of Soc. Sec.*, No. 14-14508, 2015 WL 12670524, at *11 (E.D. Mich. Oct. 7, 2015) (internal citations omitted) (finding that the ALJ "may consider the frequency and type of treatment a claimant seeks in determining the credibility of his alleged symptoms" because generally, when a claimant alleges pain so severe that it is disabling, it is reasonable to expect that the claimant will seek examination or treatment); *see Strong v. Soc. Sec. Admin.*, 88 F. App'x 841, 846 (6th Cir. 2004). But the Sixth Circuit has held that "[t]he issue of poverty as legal justification for failure to obtain treatment does not arise unless a claimant is found to be under a disabling condition." *Strong*, 88 F. App'x at 846 (citing *McKnight v. Sullivan*, 927 F.2d 241, 242 (6th Cir. 1990)). Here, Arnold was not found to be disabled, so the issue of her having no medical insurance did not arise.[14]

---

[14] Moreover, the Sixth Circuit has backed the denial of benefits where a lack of medical treatment was not a "determinative" factor in the ALJ's credibility determination. *Strong*, 88 F. App'x at 846 (affirming the district court's denial of the claimant's motion for summary

For the reasons explained above, the ALJ did not err in not considering Arnold's lack of medical insurance.

>    4.    *The ALJ Properly Relied on the VE's Testimony in Finding that Arnold Could Perform Work Requiring a Sit/Stand Option*

At Step Five of his analysis, the ALJ concluded that Arnold could perform the following sedentary jobs that exist in significant numbers in the national economy:  inspector (50,000 jobs); hand packager (60,000 jobs); and hand assembler (80,000 jobs).  (Tr. 19-20).  Arnold argues that the ALJ erred by relying on the VE's testimony in determining that Arnold could perform other work within the RFC he set forth for her.  (Doc. #14 at 16).  The Court disagrees.

If the ALJ determines that a claimant's impairments prevent her from doing her past work, the Commissioner has the burden at Step Five of "proving that there is work available in the economy that the claimant can perform." *Vandenboss*, 2015 WL 3823558, at *3 (quoting *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)); *Preslar*, 14 F.3d at 1110. "To meet this burden, the Commissioner must make a finding 'supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs.'" *Id.* (quoting *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)). "This 'substantial evidence' may be in the form of [VE] testimony in response to a hypothetical question, 'but only 'if the question accurately portrays [the claimant's] individual . . . impairments.'" *Id.* (internal citations omitted). In other words, "the ALJ is not required to question a [VE] on this issue," but "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform *specific* jobs" is needed for the Commissioner to

---

judgment, in part, because "the ALJ's opinion does not suggest that he regarded Claimant's failure to seek medical examination or treatment as 'a determinative factor' in his credibility assessment"). Given that Arnold's lack of medical treatment was only a minor factor in the ALJ's credibility determination (taking up only a few lines in a two-page, single-spaced analysis) (Tr. 18), the ALJ did not commit reversible error.

meet this burden. *Johnson*, 2016 WL 2342892, at *3 (quoting *O'Banner v. Sec'y of Health & Human Servs.*, 587 F.2d 321, 323 (6th Cir. 1978)). Because this standard "requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy[,] . . . ALJs routinely question [VEs] in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding." *Id.* (citing *Richardson v. Sec'y of Health & Human Servs.*, 735 F.2d 962, 963 (6th Cir. 1984)).

Here, the ALJ appropriately questioned the VE on Arnold's ability to perform other jobs in the national economy. (Tr. 42-48). He asked the VE "detailed and proper hypothetical questions that accurately portrayed [Arnold's] individual impairments in harmony with the relevant objective record medical evidence." *Smiley v. Comm'r of Soc. Sec.*, No. 10-10473, 2010 WL 5462548, at *7 (E.D. Mich. Nov. 1, 2010). For instance, the ALJ asked the VE to consider a hypothetical individual who has limitations with sitting; standing; carrying; using stairs; and activities such as balancing, stooping, crouching, kneeling, and crawling. (Tr. 42-47). The ALJ also had the VE consider issues such as percentage off task; absenteeism; the need to elevate a leg; the need to use a hand-held assistive device; and a required sit/stand option. (Tr. 46-48). Because the ALJ's questioning accurately portrays Arnold's individual impairments, the ALJ's reliance on the VE's finding that Arnold could perform the "specific jobs" of an inspector, hand packager, and hand assembler (Tr. 20, 47) was proper and is supported by substantial evidence. *Johnson*, 2016 WL 2342892, at *3 (quoting *O'Banner*, 587 F.2d at 323). Accordingly, the ALJ's decision is supported by substantial evidence. *Smiley*, 2010 WL 5462548, at *7 (finding that the ALJ's decision was supported by substantial evidence where the ALJ's hypothetical questions were "detailed and proper" and "accurately portrayed" the claimant's individual

27

2:15-cv-14068-MOB-DRG   Doc # 19   Filed 12/06/16   Pg 28 of 31   Pg ID 415

impairments in line with the medical evidence in the record); *Thacker*, 93 F. App'x at 729 (concluding that the Commissioner's decision that the claimant was not disabled is supported by substantial evidence because the VE's testimony "establishes a substantial number of [light and sedentary] jobs which [the claimant] could perform").

Arnold relies on *Wages v. Sec'y of Health & Human Servs.* in arguing that the Sixth Circuit "has established a general rule that a claimant who is required to alternate between sitting and standing because of health problems is not capable of performing sedentary work." 755 F.2d 495 (6th Cir. 1985); (Doc. #18 at 4). But as the Commissioner points out, this argument is incorrect. Subsequent Sixth Circuit cases discussing *Wages* illustrate how Arnold's reasoning is flawed. In *Bradley v. Sec'y of Health & Human Servs.*, for example, the Sixth Circuit explicitly stated, when affirming the denial of benefits, that an automatic preclusion from doing sedentary work of a claimant who must alternate between sitting and standing "was not our holding [in *Wages*] and these are not the circumstances of this case." 862 F.2d at 1227. The Sixth Circuit distinguished *Bradley* from *Wages*, noting that in *Wages*, "the Secretary's determinations were based on an application of the grid rather than the testimony of a [VE]." *Id.* Similarly, in *McCormick v. Sec'y of Health & Human Servs.*, the Sixth Circuit, affirming the denial of benefits, held that *Wages* did not apply because the ALJ in that case "relied upon the medical-vocational guidelines, the 'grid,' to determine that [the] claimant had the [RFC] to do sedentary work." 861 F.2d 998, 1002 (6th Cir. 1988). The ALJ in *McCormick*, on the other hand, relied not on the grid but on the testimony of a VE, who testified that a significant number of jobs existed for an individual with the claimant's limitations. *Id.*

The same is true in the instant case with Arnold; rather than relying on the grid, the ALJ relied on the testimony of the VE to determine that Arnold was capable of sedentary work. (Tr.

28

20) (finding Arnold "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy" "*[b]ased on the testimony of the [VE]*" and considering her education, work experience, and RFC) (emphasis added).   Thus, *Wages* is inapposite, and the mere fact that Arnold requires a sit/stand option does not dictate a finding that she could not perform sedentary work.

Arnold also criticizes the ALJ's decision for not specifying the frequency of her need to alternate between sitting and standing while carrying out sedentary work.   (Doc. #14 at 17) (citing SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996) ("The RFC assessment must be specific as to the frequency of the individual's need to alternate sitting and standing.")).   She argues that the ALJ instead "made a frequency finding that called for freedom to alternate 'at will'" and that "when [the ALJ] described the RFC to the [VE], he conveyed the need as a 'sit/stand option.'"   (*Id.*).   This argument is without merit.   During the administrative hearing, the ALJ did indeed specify the frequency in which the hypothetical individual would need to alternate between sitting and standing.   The ALJ specified that the hypothetical individual would require a sit/stand option *every twenty minutes*; should not stand or walk more than *two hours* out of an eight-hour workday; and can sit for *six hours* out of an eight-hour workday (with the sit/stand option *every twenty minutes*).   (Tr. 44) (emphasis added).   These frequency limitations were explicitly incorporated into the ALJ's RFC determination.   (Tr. 15).   Thus, the ALJ appropriately specified the frequency for alternating between sitting and standing in the RFC in accordance with SSR 96-9p.

For all of the above reasons, and upon an independent review of the entire record, the Court concludes that the ALJ's decision is supported by substantial evidence.

III.    **CONCLUSION**

For the foregoing reasons, the Court RECOMMENDS that the Commissioner's Motion for Summary Judgment [17] be GRANTED, Arnold's Motion for Summary Judgment [14] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: December 6, 2016                          s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge

**NOTICE TO THE PARTIES REGARDING OBJECTIONS**

Within 14 days after being served with a copy of this Report and Recommendation and Order, any party may serve and file specific written objections to the proposed findings and recommendations and the order set forth above.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d)(1).  Failure to timely file objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005).  Only specific objections to this Report and Recommendation will be preserved for the Court's appellate review; raising some objections but not others will not preserve all objections a party may have.  *See Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).  Copies of any objections must be served upon the Magistrate Judge.  *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served with a copy.  *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. § 636(b)(1).  Any such response should be concise, and should address specifically, and in the same order raised, each issue presented in the objections.

## <u>CERTIFICATE OF SERVICE</u>

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 6, 2016.

s/Eddrey O. Butts                
EDDREY O. BUTTS
Case Manager
